IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. _____ |
| v. | : | DATE FILED: _____ |
| NEIL GODFREY | : | VIOLATION:<br>18 U.S.C. § 1343 (wire fraud – 1 count) |
| | : | 18 U.S.C. § 2 (aiding and abetting)<br>Notice of forfeiture |
| | : | |


## INFORMATION

## COUNT ONE

THE UNITED STATES ATTORNEY CHARGES THAT:

1.      At all times relevant to this information, defendant NEIL GODFREY was

the owner and operator of Check Site, Inc., a third-party payment processor based in Santa Ana,

California, that provided processing services to merchant-clients through bank accounts in the

Eastern District of Pennsylvania and elsewhere.

**THIRD-PARTY PAYMENT PROCESSORS**

2.      Third-party payment processors are intermediaries between banks and

merchants.  Such processors open bank accounts in their own names and use these accounts to

conduct banking activities on behalf of their merchant-clients.  Typically, the merchant-client

does not have a direct relationship with the bank when a third-party payment processor is

involved.  Rather, the bank interacts with the third-party payment processor, which in turn

interacts with the merchant.

1

3.      Clients of third-party payment processors often are legitimate businesses. In some cases, however, clients of third-party payment processors are fraudulent merchants that do not or cannot open their own bank accounts because banks will not do direct business with them. These fraudulent merchants rely on third-party payment processors to access the banking system. At a merchant-client's direction, the processor will use its banking account to initiate debit transactions against consumers' accounts and transmit the consumers' money to the fraudulent merchant.

4.      A demand draft (also called a Remotely Created Check or RCC) is a check created not by the account holder but rather by a third party using the account holder's name and bank account information. Unlike ordinary checks, demand drafts are not signed by the account holder. In place of the account holder's signature, a demand draft contains a statement claiming that the account holder has authorized the check.

5.      When processing a demand draft, the third-party payment processor's bank receives fees from the third-party payment processor. The third-party payment processor receives fees from the merchant. The merchant keeps whatever money remains from the amount withdrawn from the consumer's account.

6.      Demand drafts are immediately rejected by a consumer's bank if the account from which the funds are to be withdrawn does not exist, the account is closed or frozen, the account owner has blocked withdrawals to the payee, or there are insufficient funds to cover the withdrawal. When a substantial percentage of demand drafts generated by a merchant through a third-party payment processor are rejected by consumers' banks, this can indicate the merchant is fraudulently generating the demand drafts. However, unlike credit card payments and Automated Clearing House transactions (electronic bank to bank transactions commonly

abbreviated as "ACH" transactions) that are monitored electronically by supervisory authorities, demand drafts are not monitored by any supervisory authority. This means that unless banks have systems in place to identify large numbers of demand drafts that are being rejected, the fraudulent generation of demand drafts will generally go undetected.

## THE SCHEME

7.     From at least as early as October 2006 to at least as late as October 2010, in the Eastern District of Pennsylvania and elsewhere, defendant

## NEIL GODFREY

devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

It was part of the scheme that:

8.     Starting at least as early as October 2006, defendant NEIL GODFREY used Check Site, a company engaged in third-party payment processing, to process transactions for fraudulent merchants. Defendant GODFREY entered into agreements with several banks to process merchant-client payments, including a bank in Irvine, California whose founders were close associates of his, and a bank in Philadelphia, Pennsylvania. Through years of experience, defendant GODFREY became an expert in finding banks that were willing to facilitate his merchant-clients' fraudulent transactions or were willing to tolerate the red flags raised by those transactions. Defendant GODFREY acted as a consultant to his merchant-clients, often explaining what they needed to do to stay under the radar of the banks and regulators and thereby continue doing business.

3

9.      Defendant NEIL GODFREY processed through Check Site payments for a group of companies that will be referred to in this information as "Merchant 1." Merchant 1 lured consumers into applying for payday loans on Internet websites. Merchant 1 took the information gathered from the payday loan applications and used it to create demand drafts to withdraw funds from victim accounts. The demand drafts were created without the applicants' knowledge or consent.

10.     Defendant NEIL GODFREY knew that high rejection rates (also known as "returns") are recognized in the industry to be an indicator of potential fraud. Defendant GODFREY thus used demand drafts to process payments for his merchant-clients, knowing that, unlike ACH transactions that are monitored and policed by an entity called NACHA, demand drafts were not monitored. This choice was vital in ensuring that his merchant clients could continue to do business. As an example, defendant GODFREY emailed an associate the following regarding Merchant 1: "They have a return rate of 67.3%. . . . Their true unauthorized rate is 14.1%. They would last about 1 day in the ACH world."

11.     Defendant NEIL GODFREY charged high fees to process transactions for fraudulent merchants. He did so because, without his assistance, fraudulent merchants would have had no other means for accessing the national payment system. For example, defendant GODFREY complained when his business partner lowered the fees Merchant 1 paid Check Site for processing, given the consumer complaints and risk created by Merchant 1's transactions: "Why you lowered their price is a real puzzle to me. Their phone complaint rate just to us is averaging 1 per thousand which is the highest number we currently have. . . . Again, . . . I am really puzzled by this. Here is a client that no bank would take if they knew the facts, and we are asked to drop our price????????"

4

12.     Defendant NEIL GODFREY frequently told his merchant-clients, including Merchant 1, to alter the appearances of their company to avoid the taint of previous fraudulent companies they had operated.  For example, in an email, defendant GODFREY advised Merchant 1 to apply for new bank accounts under a new name: "[A]pply under the new name – no mention of the old name.  I need cover in case [the previous scheme] comes up."

13.     Defendant NEIL GODFREY processed through Check Site transactions for another merchant-client that will be referred to in this information as "Merchant 2."  Through sham companies, Merchant 2 set up websites offering payday loans.  The websites were a ruse to harvest consumers' bank account information.  Consumers entered their bank account information, thinking it was part of the process of obtaining a payday loan.  At some point in the process a pop-up box would appear that instructed the consumer to "choose an authorization process."  Consumers assumed this selection was associated with their loan application.  There was no mention in the pop-up box that consumers had left the payday loan application site and were being misled into providing authorization to be enrolled in some sort of "continuity program."  Merchant 2 and his co-conspirators then withdrew money from the consumers' bank accounts while providing nothing of value in exchange.  The continuity program charged the consumer an initial enrollment fee, followed by recurring monthly or weekly fees.

14.     As defendant NEIL GODFREY was well aware, Merchant 2's schemes were fraudulent in three respects.  First, Merchant 2 never intended to provide consumers with a payday loan; the sole purpose of the websites was to obtain consumers' bank account numbers.  Second, the method of enrolling consumers in the continuity program was deceptive.  In some instances, there was no disclosure that consumers were opting into the continuity program, as opposed to making a payday loan application.  In other instances, the disclosure was in small

font or required consumers to click a box to opt out of the unwanted service. Third, the service consumers received in exchange for their monthly fees was of little to no value. One "service" was a recipe every month for how to make an alcoholic drink. Merchant 2 would get the recipe off the Internet or out of a magazine and email it to the consumers. Another credit "service" was a single-page sheet containing a toll-free telephone number.

15.    Defendant NEIL GODFREY knew that Merchant 2 withdrew money from consumers' bank accounts without authorization. For example, defendant GODFREY learned of a complaint that said the following of Merchant 2: "This company fraudulently withdrew $69.95 from my checking account without my authorization. . . . This company masquerades as a payday advance company and preys on people who are in financial need." In reaction to this complaint, defendant GODFREY sent an email to Merchant 2, stating: "Now for sure, the complainers are people who are at the bottom of society and probably have been blaming other[s] for their woes forever." Nonetheless, defendant GODFREY warned in the email that "this multi[-]level attack on a person's bank account [–] meaning they  sign up for "A and "B" "C" and "D" company hit their account for specious other services" – was resulting in complaints that could unravel the entire scheme. Defendant GODFREY concluded in the email to Merchant 2: "[W]e have too much opportunity to let this little larceny sink our boat."

16.    Defendant NEIL GODFREY advised merchant-clients to take steps to prevent banks from learning about consumer complaints about unauthorized withdrawals. In an email to another individual involved in payment processing, Godfrey stated: "[T]he returns can easily be submerged in other transactions. It is not the returns that cause the grief – it is the . . . phone calls. . . .  In every bank I have dealt with the phone calls [were] always the problem."

17.     Defendant NEIL GODFREY advised Merchant 2 how to manufacture the façade of a legitimate business to defeat bank attempts at due diligence.  For example, defendant GODFREY instructed Merchant 2 to create a website "[s]ince you are selling on the Internet you should have a website."  Defendant GODFREY further tutored Merchant 2:  "If you don't [have an existing website], just manufacture one that makes everyone happy."  Defendant GODFREY continued his lessons on how to defeat bank due diligence efforts, advising:  "Have you a utility bill?  [T]hat should be easy.  If you don't have one[,] manufacture one."  He stated that Merchant 2 would need "[c]orporate or personal financial statements – again you can manufacture this."

18.     Defendant GODFREY's advice to merchant-clients is epitomized by an email he sent to Merchant 2:

> It has been a lesson for all of us, and the lesson we have learned is
> that we must trick the [bank] folk.  It means you need to set up
> some type of web site front.  What we need to do is set up a
> legitimate website selling anything you can think of – that is what
> you get approved on.  It is irrelevant if anything is ever sold there –
> just so it exists.  The problem with us is that we tried to be straight
> with the SOB's and it just does not work. . . .  What we need to do
> going forward is set up a retail company on the web that sells stuff.
> In the mean time we set up false credit card approval etcetera.  It is
> this we use to run the transactions.  Yes, there will be a lot of
> returns, but what we do is send through transactions over the next
> few weeks that don't have high returns.  They stop looking and
> then we can run the regular stuff. . . .  [A]s long as we don't have

7

telephone calls we are great. We still keep the same plan and that is

after several months we junk that company and go to another

company. I will tell my people in Nevada to set up such a

company, but you should do the same. I want to put this plan into

immediate effect.

## THE WIRING

19.    On or about August 15, 2010, in the Eastern District of Pennsylvania and

elsewhere, defendant

## NEIL GODFREY,

for the purpose of executing the scheme, and aiding and abetting its execution, caused to be

transmitted by means of wire communication in interstate commerce, an email message from the

Central District of California to a bank official in Philadelphia, Pennsylvania, which promised to

provide the bank with due diligence materials relating to merchant-clients.

All in violation of Title 18, United States Code, Sections 1343 and 2.

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

At all times relevant to this information:

1.      As a result of the violation of Title 18, United States Code, Section 1343 set forth in this information, defendant

## NEIL GODFREY

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to such offenses, including, but is not limited to, the sum of $5.5 million.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred to or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b), both incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

9

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C) and 982(a)(2).

ZANE DAVID MEMEGER
UNITED STATES ATTORNEY